WILLIAM WEST FRAZIER ' another, Receivers, &c. *v.* JACOB WILLOX ., and another.

In ordinary cases of attachment, or where a judicial sequestrator is necessary, the law has provided an officer, to wit, the sheriff, to take care of the property seized; but he is to act only in the event of the parties failing to appoint a fit and proper sequestrator, or keeper of their own selection.

Art. 2941, *et seq.* of the Civil Code, which authorize the appointment, and prescribe the duties of conventional sequestrators, do not prevent parties from conferring other powers on such officers.

Parties interested in a debt or other property, may appoint agents to take care of their interest, and vest them with all necessary powers. C. C. 2954, *et seq.*; and an action may be maintained in the name of the agent, as well as in that of the principal, if power to that effect be given.

The judges of the inferior courts cannot, of their own accord, appoint receivers for the purpose of collecting or keeping funds, or evidences of debt which may be the subject of litigation before them. Such appointments can be made only with the consent of all the parties interested, and the assent of the judge can add nothing to the powers of the persons so appointed,

An attaching creditor can have no higher or better right to the property attached than his debtor, unless he can show some fraud or collusion by which his rights have been impaired. Liens or privileges existing on the property must be respected.

| 4r 517 |
|---|
| 49 480 |
| 4r 517 |
| 51 145 |
| 4r 517 |
| 52 179 |
| 4r 517 |
| 6108 531 |
| 108 535 |
| 4r 517 |
| 124 146 |

Frazier and another, Receivers, &c. v. Willcox and another.

A garnishee has no right to interfere in the merits of the case or between ? and defendant. He is to be viewed as a stakeholder, bou￼ ￼ ￼ disclos If his declarations be controverted, he may support them, and ￼ oppose any ￼ ￼ ￼. that will operate to his prejudice. As to him, the question￼ are, ￼ ￼ ￼le and whether he can safely pay to the plaintiff. Where there is any doub￼ ￼ ￼o the validity of the payment, a stay of proceedings will be ordered, or sec￼uity t￼ indem- nify the garnishee will be required.

The Legislature has power to prohibit foreign corporations from contracting in this State; but until it does so, contracts so made will be enforced

The capacity of a foreign corporation to sue, is well establishe￼

A contract made in this State, by the Bank of the United Stat￼ ￼ted by the State of Pennsylvania, to secure the re-payment of money loane,￼ ￼ ￼alid.

Arts. 423 and 437 of the Civil Code, cannot be construed to ￼ ￼ corporations created by other States, from contracting in this. Art. 423 is direc￼o￼ ￼ly, and declares that corporations, meaning those in the State, must b￼e created by ￼c Legislature. The alternative expression, "*unauthorized by law, or by an act of the Legislature,*" in art. 437, shows that it alludes to other corporations than those created ￼y t￼e Legislature of this State, and intended to acknowledge the public ￼aracter of cor- porations authorized by the laws of foreign Stat￼s.

The act of 13th March, 1837, ch. 66, relative to limited or anonymous partnerships, does not apply to corporations, but to pri￼ ￼ ￼ations of individuals.

Nothing in the charter of the Bank of the U￼ ￼d State￼ created by the State of Pennsylvania, prohibited it from making loans in Louisiana, at the highest rate of interest allowed by the laws of the latt￼ ￼ ￼ ￼ ￼ ￼d such loans are not usurious.

A foreign corporation authorized to contract in ￼ ￼ ￼ate, may contract according to its laws, where the charter contains no pi ￼ ￼ ￼.

APPEAL from the Commercial Court of New Orleans, *Watts*, J.

GARLAND, J. The petitioners, styling themselves to be receivers appointed by the Commercial Court, with the consent of all parties, in the suit of the *United States of America* v. *The President, Directors, & Co. of the Bank of the United States, Bacon and others, intervenors*, represent that the defendants are indebted to them in the sum of $7,733 33, with interest at ten per cent, from the 17th June, 1837, and costs of protest, on two promissory notes, drawn by Willcox, to the order of Willcox, Anderson & Co., and endorsed by them, which notes are secured by a mortgage executed on the 29th July, 1837, to the Bank of the United States, and accepted by their agent, Jno. Minturn, President of the Merchants Bank of New Orleans. The petition states, that in the suit of the *United States* v. *The Bank of the United States*, the notes were attached as the property of the latter, and that they have been since claimed by certain persons, as assignees

Frazier and another, Receivers, &c. v. Willcox and another.

f these notes, and of a large amount of other property, by virtue
several assignments made by the Bank ; pending which con-
troversy, the petitioners were, by consent of all parties then in-
terested, appointed to collect and receive the sums due from all
persons, with full powers to sue and recover the same : where-
fore, they pray for judgment.

To this suit the defendants excepted : 1st. That all the matters
in relation to this claim, were pending in the suit of the *United
States* v. *The Bank of the United States*, already mentioned.
2d. That the plaintiffs have no claim against them, and have no
legal authority to institute and maintain this suit. 3d. That an
attachment has been levied upon the amount claimed at the in-
stance of George Beach, in another suit in the same court, of
which the respondents have been duly notified ; and that the as-
signment under which the present plaintiffs claim, is fraudulent,
without consideration.

They, therefore, pray to be dismissed; which prayer being re-
d, and the exceptions overruled, the defendants answered.

mitting the execution of the notes, and mortgage, they aver
that the loan of money which they are intended to secure, was
in this State, by the Bank of the United States of Pennsyl-
which had established a branch banking house and agency in
rleans, conducted by citizens of the State, for the benefit of
resaid Pennsylvania corporation, which was contrary to the
this State, and its *known policy*, and highly injurious to its
interests. They aver that, consequently, said contract cannot be
enforced.

The defendants further allege, that usurious interest is claimed,
as the contract is to pay ten per cent per annum, whilst by the
charter of the Bank, not more than six per cent per annum, can
be received by it.

They also deny that the United States can recover against them,
as their claim against the Bank is not established. They deny
the right of the assignees of the Bank to recover, because the as-
signments are invalid ; and allege, if the Bank of the United
States has any right to recover, that the loan or consideration
given for the notes sued on, consisted of notes of the Bank, and if
liable at all, which is denied, they pray to be condemned to pay

in the notes of that Bank. They pray for a judgment in their favor, and annex a variety of interrogatories, which seem not to have been answered; nor was any attempt made by either party to procure answers, although an order to that effect was made.

Upon the merits, there was a judgment for the plaintiffs with interest, at six per cent per annum, and the defendants have appealed.

The points that have been raised in the case and insisted on, are :—

1st. The power of the plaintiffs to maintain this action.

2d. The effect of the attachment of George French.

3d. The authority of the Bank of the United States to do and sue in this State.

4th. The plea of usury.

A mass of testimony comes up with the record, in a most confused and irregular form, much of which relates more to the commercial operations of a few individuals and corporations, than to the legal questions which the case presents. It is too voluminous to be fully stated. We shall, therefore, in connection with each point, state what we consider as established by it.

The question of the pendency of another suit of the United States and the Bank of the United States against the defendants is, we think, involved in the first question we propose to consider. In relation to that, it is shown that on the 20th of January, 1842, the United States, by their Attorney for the Eastern District of this State, commenced a suit by attachment, in the Commercial Court, against the Bank of the United States, incorporated by the State of Pennsylvania, claiming a sum approaching nearly to two millions of dollars. An attachment was issued, under which notes and claims to an amount largely exceeding $2,000,000 were seized, and taken into possession by the Sheriff; the debtors were summoned as garnishees, and called on to answer what they were owing the Bank, or what property or money belonging to it was in their possession; and a judgment was asked against them. Among the notes seized, and persons cited, as garnishees, were the notes and persons now before us. A supplemental petition was filed about two months after the original, representing more particularly the claim of the United States, and

reducing the demand to about $366,000, for which judgment was prayed, and these defendants and others were made garnishees, or continued as such, and a judgment asked for. The defendants answered at great length, the purport of which is, that although they gave the notes, their amount cannot be recovered; and they ask to be dismissed. Pending these proceedings, three persons claiming to be the assignees of the Bank of the United States, of all the debts and property attached, intervened in the suit, and claimed the whole as belonging to them, presented an assignment, and asked for a judgment giving them the whole property and evidence of debts.

On the 16th of April, 1842, the following order was entered in the case :—

"*The United States of America* v. *The President, Directors & Co., of the Bank of the United States.* On motion of Baylie Peyton, United States District Attorney, and of J. R. Grymes and Thomas Slidell, of counsel for the various intervenors in this cause, and also, as attorneys of the defendants appointed by this court, and on suggesting to the court, that the assets covered by this attachment, from the state of monetary affairs and other causes, are subject to depreciation; and that the litigation herein may be of long continuance; and it appearing to the court, that the appointment of receivers to collect the debts covered by this attachment, and to administer generally the property attached, is important for the interests of all parties concerned, it being understood, that said intervenors hereby waive no claims for indemnity, for any thing done, or to be done herein : It is ordered, that William West Frazier and Christopher Adams, Jr. be appointed joint receivers; that they have full power to take charge of, and administer the property attached herein, and to pursue and collect by due course of law, the debts herein attached, and to that end to employ suitable counsel at the charge of said fund, and to do such other acts, and things, as appertain to the duty, and business of receivers; and that said receivers do hold such appointment, subject to such orders, and instructions as this court from time to time shall establish for their guidance in the premises; and that said receivers shall receive such compensation as the court shall

establish to be paid out of such funds ; and it is further ordered, that said receivers be dispensed from giving bond."

This order and appointment were, as appears, instigated, and procured by the Attorney of the United States. His authority to consent to it has not been denied, and was in fact admitted by one of the counsel for the defendants. The counsel for the assignees, who were intervenors, also assented, as did the attorney representing the Bank, who had been appointed by the court ; and his act has been expressly and fully ratified since, by a resolution of the Board of Directors, and the assignees have given their assent also. Thus every party before the court, who was interested in the preservation of the property and the collection of the debts, consented to the appointment of the plaintiffs, and to the power vested in them. From the nature of the property attached, much of it consisting of notes endorsed and falling due, secured by mortgage or other securities, it was very important to have some special superintendant, who would see it protected and properly managed.

Against the appointment and authority of the persons appointed as stated, the defendants and their counsel loudly and zealously protest. They have undertaken against the appointment in behalf of various persons who do not complain themselves, and whilst they protest, that nothing can be recovered of them legally, they object to a party with whom their contested rights may be settled. The tribunal on whose records this assent and appointment is entered, has been denounced as usurping authority, and intending to introduce rules of practice, and principles new to our courts, and foreign to our jurisprudence. It is true, that the mode adopted of appointing the plaintiffs to exercise the functions which they claim, is somewhat novel in our courts ; but the circumstances are not of an ordinary kind. An immense amount of debt owing by a great number of individuals, is unexpectedly thrown into a litigation, likely to be protracted between the parties. The debtors of one party whose solvency the other is deeply interested, from the peculiar state of affairs, require to be watched, and securities to be made available ; and for the purpose of general security, the court permits the parties interested, to appoint their own agents and keepers of the pro-

perty; and, approving of them, directs the Sheriff to deliver to these agents or receivers, the property in his custody, that it may be administered for the benefit of all concerned; the court taking care to have those persons under its control, that it may see, that the trust is faithfully administered.

In ordinary cases of attachment, or when a judicial sequestrator is necessary for the purposes of justice, the law has provided an officer, to wit, the Sheriff, to take care of the property seized. He is to act, in the event of the parties failing to appoint a fit and proper sequestrator, or keeper of the property. But this conservatory provision of the law, does not preclude the parties from making any other arrangement, that will be more to their interest, and which may promote their common convenience. Art. 2941, of the Civil Code, authorizes the appointment of conventional sequestrators. Subsequent articles prescribe their duties. But because this is specified, it does not prevent the parties from conferring other powers and authority. A conventional sequestrator cannot by law dispose of the thing in litigation, without the consent of the parties; but if those interested choose to assent, we know of no law to restrain them, and the contract would be binding afterwards. Suppose a number of horses or cattle to be in litigation, and sequestered; and that it should be inconvenient, or impossible for the Sheriff to take care of them, the parties may surely place them in the care of any person, or persons they may select, and if they think proper direct them to be sold, and the proceeds to abide the result of the decision. In such a case, if it be necessary, in order to protect the property from injury or destruction, we have no doubt, that the sequestrator could maintain any action or suit that might be necessary. Many cases can easily be supposed, where the conferring of such authority would be useful and convenient.

But it is said, that the plaintiffs are not conventional sequestrators, as they are not so called, and that we cannot presume, that the authority and duty appertaining to such were intended to be conferred. It may be that the Judge of the inferior court has not selected a name familiar to us, and known to our system of laws; yet, it is very certain, that both he and the parties intended to do something, and they have conferred on the plaintiffs powers and

authority well known to us. When we look into the law in rela-
tion to agency, we find ample authority for the acts of the parties
in this case : parties owning or interested in a debt, or property,
may appoint agents to take care of their interests, and vest them
with all necessary powers. Civil Code, art. 2954, *et seq.* A
power to sue, to collect a debt, to give an acquittance, or to do
any other act, may be deputed, and an action may be maintained
in the name of the agent, as well as in that of the principal, when
power is given to that effect. The debtor will be protected, if
the power to receive is sufficient. The appellation of receiver
may not be exactly appropriate ; but a legal name is only impor-
tant, when it is necessary to enable us to ascertain the authority
and duties appertaining to the place. But when the powers and
functions are specified, it is not difficult to assign the character
and legal species ; and if our laws have not given a name, we
may be justified in seeking elsewhere for one that is appropriate.
To us it appears, that the plaintiffs stand in the relation of agents
to the United States, the Bank of the United States, and the as-
signees of the latter, and that as such they can sue, and dis-
charge the defendants whenever they shall pay the debt claimed
of them.

If it were not in the power of parties to enter into compromises,
and confer authority on third persons, for their mutual benefit,
much injury might result. The case before us is strongly illus-
trative of the position. Three parties are litigating about their
respective rights ; a very large amount of debts is owing to one
of them ; the other two claim those debts, or the benefit of them ;
all are interested in their safety, and prompt collection ; and mu-
tually agree, that so much of the rights of all or either, as may
be necessary to preserve the things in litigation, shall be vested in
some disinterested persons, who shall act for the common benefit.
If some such power had not been conferred, it is apparent, that
severe losses must have been the consequence. This appoint-
ment is denounced, not by a party interested in preserving the
debt and security, but by the debtor, who complains, that it is
very hard, that all agree that he shall pay to particular persons,
and thus relieve his property from mortgage, and himself from in-
terest, which is alleged to be usurious. It cannot be possible,

that the rights of litigants are so shackled by proceedings in an attachment, that they are unable to concentrate all their rights against a garnishee, when necessary to save the debt about which the suit is pending. Parties are not bound to stand still, and see the alleged common debtor wasting his means, and depriving them of their security, without the hope of relief; nor are courts so powerless as to permit it. If no positive provision had been made in a case where so much injury must result, a court would be justified in resorting to the equity power conferred by the 21st article of the Civil Code.

In deciding that the plaintiffs can maintain the present action, we are not to be understood as giving our sanction to an opinion sometimes expressed, that the Judges of the inferior courts, without the assent of the parties to a suit, or with the consent of only one of them, can exercise the powers of a chancellor, and appoint of their own accord receivers for the purpose of collecting, and keeping the funds attached, or that may be the subject of litigation. Our opinion is, that the capacity of the plaintiffs is derived entirely from the consent of the parties who were interested at the time they were appointed. We do not believe, that the assent of the Judge added to their powers in the slightest degree; but it may be a security to the parties, to have the conduct of their agents under their supervision, and that of the tribunal, before which their case is pending. The fact, that the appointment of the plaintiffs is entered on the records of the Commercial Court, gives them no powers not conferred by the terms of the procuration, and the laws. The Judge has permitted the litigants before him to enter, on the minutes of his court, an agreement of their own, which for special purposes, vests a portion of their rights in others, to be exercised for the common benefit. No injury can result to the defendants from the appointment of the plaintiffs, unless it be that of being compelled to pay the debt they owe. The only question in which they are interested is, whether a payment made to the plaintiffs will protect them from further pursuit. We have no doubt but it will; and a judgment for or against them in this suit, will amply protect them, either against the claim of the United States, of the Bank of the United States, or of the persons claiming to be assignees of that institu-

tion. Any defence which could be set up against this contract, against any one of those parties, may be offered in this action; and in fact we find the defendants availing themselves freely of their rights, and going without objection, most fully into matters and defences which go to invalidate the original contract entirely. They cannot complain of being deprived of a single point of their defence ; the greatest latitude in the admission of testimony and argument, has been allowed ; and if the defence shall not prove successful, it will not be because the parties have not been fully heard upon every point, both technical and legal, which they had to urge, aided by able counsel, but because of the inherent weakness of their case.

The counsel for the defendants have throughout their argument labored to keep the rights of the United States, of the Bank of the United States, and of its assignees separate and distinct; and have warred against them in detail, shielding themselves under each other, whenever their own defences proved too weak. They by turns advocate and attack the rights of their opponents, whenever it suits their own interests ; and the burden of their complaint is, that all those who are interested in compelling them to pay their debt, have combined against them. The defence exhibits the skill of the generals, but is too feeble to resist the alliance. The counsel asks, who are the constituents of the plaintiffs, and what right of action can they separately maintain against the defendants ? We think the constituents of the plaintiffs are all the parties who deputed their rights to them ; and it is not competent for the defendants, to play off the rights of one of those parties against the others, and thus defeat all.

The defendants insist, that the substantial matters of their defence are pending in another suit, instituted by the United States against the Bank of the United States, in which they have been summoned as garnishees, and that two actions cannot be prose cuted against them, at the same time, for the same cause of action. The answer of the defendants in the attachment case referred to, does not exhibit the same grounds of defence as those now alleged. It avers that they are not indebted to the Bank of the United States, except on a contingent liability upon certain notes executed or endorsed by them ; and denies generally that they

Frazier and another, Receivers, &c. v. Willcox and another.

are legally bound therefor.   The deed of assignment and notice
of it, and a seizure made by the United States, which its attorney
admits has long since been abandoned, are interposed as reasons
why they should not be condemned.   The same grounds of de-
fence are therefore not set up in the original attachment, as in
this suit; but if they were, it would not make any difference, as
that action has ceased to be prosecuted, although the record does
not show whether or not it has been formally dismissed as to the
defendants.   If it has not, the judgment in this case will protect
the defendants fully, and enable them to arrest it very speedily,
should any attempt be made to prosecute it.

The third ground of defence is, that one George Beach has
commenced a suit against the Bank of the United States by at-
tachment, and has also cited the defendants as garnishees, and
that the assignment, under which the plaintiffs claim, is fraudulent
and without consideration.   This attachment is interposed to pro-
tect the defendants from the claim of the plaintiffs; although, in
their answer to it, they set up the assignment made to one of
their constituents, and the seizure by another, as grounds of de-
fence.   George Beach does not complain before us in this case.
On the contrary, we find from the record introduced in evidence
by the defendants, that he has made the plaintiffs parties to his
petition, and called on them to answer, as garnishees, what pro-
perty or assets they have belonging to the Bank of the United
States.   The counsel for the defendants aver, that the attachment
of Beach was anterior to the appointment of the plaintiffs as re-
ceivers or agents.   In this they are mistaken; and it was doubt-
less a knowledge of this fact which induced Beach to make them
parties to his suit.   It is a well settled principle, that an attaching
creditor has no higher or better rights to the property or assets at-
tached than his debtor has, unless he can show some fraud or col-
lusion, by which his rights are impaired.   If liens or privileges
exist on the property or money, they must be respected.   1 Rob-
inson, 209, 443.   Beach's attachment being subsequent to that of
the United States, and to the arrangement made by all the parties
interested at the time, we do not well see how he can avoid it;
but as to him we shall express no opinion now.   The defendants
allege, that the United States cannot recover against them, be-

cause they have no judgment against the Bank; that the Bank cannot recover because it has made an assignment of the debt; and that the assignees cannot recover because the United States has attached; that all united cannot recover against them, because Beach has subsequently attached; and that he cannot recover, in consequence of the previous proceedings, and the fact that they are advised by counsel that they are not bound to pay any thing. The position of the defendants, it would seem, is well fortified, but we do not deem it impregnable. This court, in 14 La. 511, and 19 La. 405, held, that a garnishee had no right to interfere with the merits of the case between the plaintiff and defendant. He is viewed as a stakeholder, bound to declare the truth, and if his declaration is controverted to support it, and to prevent any decision that will operate to his prejudice. The defendants then, have no right to inquire into the merits of the controversy between the conflicting parties. The simple question, as respects them, is, are they indebted? And if so, can they safely pay to the plaintiffs? The defendants aver that they are not legally bound to pay the notes they acknowledge to have signed; and that the question cannot be inquired into until the controversy between all the other parties is decided. The United States must get a judgment against the Bank, before either can proceed to a liquidation of the demand of the latter on the defendants. This argument entirely mistakes the nature of the claim of the attaching creditor. It is not that the defendants are indebted to them, but simply a prayer that their debt against the Bank may be paid out of whatever may be owing by the defendants to it. Is the Bank then bound, whilst its claim is denied, to lie idle or remain powerless, until it can terminate its controversy with another adversary, and in the meantime give an opportunity to its debtor to squander his means, or give preferences to others, and this in a case, where that adversary joins in its prayer?

The principle settled by this court in the case in 10 Martin's Reports, 609, 628, was, that the garnishee must be protected, and not put in a situation whereby he may be compelled to pay twice. Consequently, we ordered a stay of proceedings, until the result of another suit, in which he had been previously cited as a garnishee, could be ascertained. The court did not say that because

there was another garnishment, there could not be a judgment in the case before them. In this case, if we thought there was any probability that the defendants would be compelled to pay twice, we should not hesitate in directing a stay of proceedings on the judgment, or directing the plaintiffs to give security to indemnify the defendants against any such consequences. The cases in 12 La. 16, and 13 La. 567, are based upon a state of facts very different from the present, and the same principles of law are not applicable. The latter case, if it has any application to the present, goes to show that Beach's attachment presents no obstacle to a judgment against the defendants; as it says, that the last attaching creditor can have no judgment against the garnishee, until the previous attachments are ascertained and paid. The attachment of Beach does not, in our opinion, present any obstacle to a judgment being rendered.

We come now to the defence most relied on by the counsel for the defendants : 1st, that the incorporation of the Bank of the United States by the Legislature of Pennsylvania, for the purpose of transacting banking business in the other States of the Union as well as within her own limits, and the exercise of that power in the State of Louisiana, is a usurpation of sovereignty on the part of the former State, a violation of the constitution of the United States, and an assumption of powers delegated by the States to the general Government.

2d. That these acts of the State of Pennsylvania, are an invasion of the sovereignity of this State; and would, if sanctioned, have the effect of yielding to the Legislature of Pennsylvania, the power of making laws co-extensive with our own Legislature.

3d. That the bank-charter is both a law and a contract : that as a law, it has no extra-territorial effect, and as a contract it can have no operation in this State.

4th. That the exercise of its corporate powers by the said Bank, within the limits of this State, is a violation of its laws, and in contravention of its well known policy.

The allegations contained in the first and second points would, if sustained, raise very grave and serious grounds of controversy, and would show, that the public authorities of this State had been very inattentive to the public acts of a powerful State of the con-

federacy, and remiss in preserving the dignity and character of our own. We have looked with some care, at the evidence in the record, and endeavored also to refresh our recollection as to the history of the legislation of Pennsylvania ; and are unable to discover any thing on the part of our sister State, that has the appearance of a usurpation of our rights as a State, or of a claim of power to legislate for our people. The power of the Legislature of Pennsylvania to charter the Bank of the United States, we believe is conceded ; at any rate we shall not now question it. The charter is one that is generally known ; and there is nothing in it which authoizes the corporation to exercise any power in this State in violation of our laws, or places it on a ground different from the corporations created by other States. We see no attempt to make laws for us, or to exercise any legislative authority within our limits.

That a law of the State of Pennsylvania has no extra-territorial effect, other than what is given to it by our own laws, is undeniable, and we suppose it is equally true, that the Legislature could prohibit a corporation created by another State from contracting in this ; but until some better evidence of such an intention is exhibited, we shall be careful how we enforce such a restriction.

The evidence in relation to this part of the case shows, that about the month of January, 1836, the Bank of the United States, chartered by Congress, in anticipation of the expiration of its charter, appointed an agent in New Orleans, where it had a branch and a large sum of money owing to it, for the purpose of liquidating its affairs. Shortly afterwards, the Legislature of Pennsylvania incorporated the institution, which succeeded to all the property and assets of the congressional Bank. The agent in New Orleans, was directed to invest the funds he received, in bills of exchange drawn upon merchants, or others in northern cities, and in foreign countries. He was also directed to throw into circulation as many as possible, of the notes of the institution he represented. The Legislature of our State, in the month of February, 1836, incorporated an institution known as the Merchants Bank of New Orleans, of which Willcox, one of the defendants, was a corporator. The stock of this institution was all taken by a few individuals, who about the month of September following, sold the

whole of it to the Bank of the United States, for a bonus of more than a $100,000 ; the defendant Willcox, and a few others, nominally holding a sufficiency of shares to qualify them to act as directors. Whatever capital the Merchants Bank ever had, was furnished by the Bank of the United States; and shortly after the purchase by the latter, the former Bank went into operation, and immediately commenced acting as the known and public agent of its owners. In obedience to the will of its principal, it circulated very extensively the notes of the Bank in Philadelphia, bought bills of exchange, discounted notes, and contracted in every mode permitted by its charter. In consequence of its extensive operations, the debts owing to and from it, soon exceeded the limit fixed in the charter; when the Bank of the United States, to enable itself to carry on its operations. appointed the President and Cashier of the Merchants Bank, their agents also, who kept their account in the bank, where it frequently amounted to millions of dollars.

This was, in fact, but keeping two accounts for the execution of the same mandate, and was intended to evade the restriction imposed. The fact of the agency was one of general notoriety ; and the annual reports made to the Legislature, state it in unequivocal terms. The Bank of the United States had a similar agent at Natchez, and a personal agency in Mobile, with whom the Merchants Bank was directed to correspond. Property was purchased for the purpose of erecting a suitable building for the transaction of business. In a word, the Merchants Bank was as much a branch of the Bank of the United States, as the branch of the National Bank, which had ceased to exist, ever was. For several years previous to the time when the Merchants Bank was incorporated, at the same session, and subsequently, the Legislature created numerous corporations, by the express provisions of some whose charters it was evident, that it intended them to contract and operate in other States of the Union ; for, they were authorized to raise their capitals by the sale of the bonds of the State, or otherwise to borrow money in foreign countries. With the agents just mentioned, the defendants contracted ; but whether the obligation now sued on, was in renewal of a previous one, is not shown. We, therefore, regard it as a primary contract. Under these cir-

cumstances, we are called on to say that this contract is not obliga
tory, is opposed to public policy, and therefore void.

The defendants' counsel contend, that the Bank of the United
States had no right to make a contract in this State, or to exercise
such powers as it did ; wherefore, all its contracts are null.   They
argue, that the Bank could not migrate or establish a branch in
this State, and that the comity extended upon the principles of na-
tional law, ought not to be extended to this corporation ; so inde-
fensible has been its conduct and policy.   We admit fully the
power of the Legislature to pass an act restraining foreign corpo-
rations from contracting in this State ; but, until such an act is
passed, we cannot, upon any principle of justice and reciprocity,
refuse to enforce a contract so made.   In every State where the
courts have annulled such contracts, there is a restraining statute ;
and, in those States where no restraining statute exists, the con-
tracts have been enforced.   7 Wend. 276.   2 Rand. 465.   8 Da-
na's Ky. Rep. 114.   The capacity of foreign corporations to sue,
has been long and well established.   Angel on Corporations, 210.
7 Mart. 31.   2 Rand. 465.   17 Wend. 170.   The capacity of
foreign corporations to contract is amply sustained by authority ;
and, since the decision of the Supreme Court of the United States,
in the cases of *The Bank of Augusta* v. *Earle,* *The Bank of the
United States* v. *Primrose,* and *The Carrollton Bank* v. *Earle,*
13 Peters, 519, we supposed there was not a doubt on the sub-
ject.   The counsel for the defendants have endeavored to weaken
the force of these decisions, by quoting the arguments of the
counsel for the plaintiffs, and the admissions they made ; but they
have not succeeded in doing so.   The judgment of *the court* is
conclusive upon this part of the case, and the counsel have not
been able to meet the argument of the Chief Justice on it.   He
says, at pages 588–590 of the above volume : " The charter of
the Bank of Augusta authorizes it, in general terms, to deal in
bills of exchange ; and, consequently, gives it the power to pur-
chase foreign bills as well as inland ; in other words, to purchase
bills payable in another State.   The power thus given, clothed
the corporation with the right to make contracts out of the State,
in so far as Georgia could confer it ; for, whenever it purchased
a foreign bill, and forwarded it to an agent to present for accep-

tance, if it was honored by the drawee, the contract of acceptance was necessarily made in another State ; and the general power to purchase bills without any restriction as to place, by its fair and natural import, authorized the bank to make such purchases wherever it was found most convenient and profitable to the institution ; and, also, to employ suitable agents for that purpose. The purchase of the bill in question was, therefore, the exercise of one of the powers which the bank possessed under its charter ; and was sanctioned by the law of Georgia creating the corporation, so far as that State could authorize a corporation to exercise its powers beyond the limits of its own jurisdiction.

"But, it has been urged in argument, that, notwithstanding the powers thus conferred by the terms of the charter, a corporation, from the very nature of its being, can have no authority to contract out of the limits of the State ; that the laws of a state can have no extra-territorial operation ; and that, as a corporation is the mere creature of a law of the State, it can have no existence beyond the limits in which that law operates ; and that it must necessarily be incapable of making a contract in another place.

"It is very true, that a corporation can have no legal existence, out of the boundaries of the sovereignty by which it is created. It exists only in contemplation of law, and by the force of law ; and where that law ceases to operate, and is no longer obligatory, the corporation can have no existence.  It must dwell in the place of its creation, and cannot migrate to another sovereignty.  But, although it must live and have its being in that State only, yet it does not, by any means, follow that its existence there will not be recognized in other places ; and its residence in one State creates no insuperable objection to its power of contracting in another. It is, indeed, a mere artificial being, invisible and intangible ; yet it is a person, for certain purposes in contemplation of law, and has been recognized as such by the decisions of this court.  It was so held in the case of *The United States* v. *Amedy*, 11 Wheaton, 412, and in *Beaston* v. *The Farmers Bank of Delaware*, 12 Peters, 135.  Now, natural persons, through the intervention of agents are continually making contracts in countries in which they do not reside, and where they are not personally present when the contract is made ; and nobody has ever doubted

the validity of these agreements.  And what greater objection can there be to the capacity of an artificial person, by its agents, to make a contract within the scope of its limited powers, in a sovereignty in which it does not reside ; provided such contracts are permitted to be made by them, by the laws of the place.

"The corporation must, no doubt show, that the law of its creation gave it authority to make such contracts, through such agents.   Yet, as in the case of a natural person, it is not necessary that it should actually exist in the sovereignty in which the contract is made.   It is sufficient, that its existence as an artificial person, in the State of its creation, is acknowledged and recognized by the law of the nation where the dealing takes place ; and that it is permitted by the laws of that place to exercise there the powers with which it is endowed.

"Every power, however, of the description of which we are speaking, which a corporation exercises in another State, depends for its validity upon the laws of the sovereignty in which it is exercised ; and a corporation can make no valid contract without their sanction, express or implied.   And this brings us to the question which has been so elaborately discussed, whether, by the comity of nations, and between those States, the corporations of one State are permitted to make contracts in another.   It is needless to enumerate here the instances in which by the general practice of civilized countries, the laws of the one, will, by the comity of nations, be recognized and executed in another, where the rights of individuals are concerned.   The cases of contract made in a foreign country are familiar examples ; and courts of justice have always expounded and executed them, according to the laws of the place in which they were made ; provided that law was not repugnant to the laws or policy of their own country. The comity thus extended to other nations is no impeachment of sovereignty.   It is the voluntary act of the nation by which it is offered ; and is inadmissible when contrary to its policy or prejudicial to its interests.   But it contributes so largely to promote justice between individuals, and to produce a friendly intercourse between the sovereignties to which they belong ; that courts of justice have continually acted upon it, as a part of the voluntary law of nations.   It is truly said, in Story's Conflict of Laws, 37,

'That in the silence of any positive rule, affirming, or denying, or restraining the operation of foreign laws, courts of justice presume the tacit adoption of them by their own government, unless they are repugnant to its policy, or prejudicial to its interests. It is not the comity of the courts, but the comity of the nation which is administered and ascertained in the same way, and guided by the same reasoning by which all other principles of municipal law are ascertained and guided.'

" Adopting as we do, the principle here stated, we proceed to inquire whether, by the comity of nations, foreign corporations are permitted to make contracts within their jurisdiction ; and we can perceive no sufficient reason for excluding them, when they are not contrary to the known policy of the State, or injurious to its interests. It is nothing more than the admission of the existence of an artificial person created by the law of another State, and clothed with the power of making certain contracts. It is but the usual comity of recognizing the law of another State. In England, from which we have received our general principles of jurisprudence, no doubt appears to have been entertained of the right of a foreign corporation to sue in its courts ; since the case of *Henriquez* v. *The Dutch West India Company*, decided in 1729. 2 L. Raymond, 1532. And it is a matter of history, which this court are bound to notice, that corporations created in this country, have been in the open practice, for many years past of making contracts in England of various kinds, and to very large amounts ; and we have never seen a doubt suggested there of the validity of these contracts, by any court or any jurist. It is impossible to imagine that any court in the United States would refuse to execute a contract, by which an American corporation had borrowed money in England ; yet if the contracts of corporations made out of the State by which they were created, are void, even contracts of that description could not be enforced.

" It has, however, been supposed that the rules of comity between foreign nations do not apply to the States of this Union ; that they extend to one another no other rights than those which are given by the constitution of the United States ; and that the courts of the general government are not at liberty to presume, in the absence of all legislation on the subject, that a State has adopted the comity of nations towards the other States, as a part

of its jurisprudence, or that it acknowledges any rights but those
which are secured by the constitution of the United States.   The
court think otherwise.   The intimate union of these States, as
members of the same great political family, the deep and vital in-
terests which bind them so closely together should lead us, in the
absence of proof to the contrary, to presume a greater degree of
comity, and friendship, and kindness towards one another, than
we should be authorized to presume between foreign nations.
And when, (as without doubt must occasionally happen) the inter-
est or policy of any State requires it to restrict the rule, it has
but to declare its will, and the legal presumption is at an end.
But until this is done, upon what grounds could this court refuse
to administer the law of international comity between these
States?   They are sovereign States; and the history of the past
and the events which are daily occurring, furnish the strongest
evidence that they have adopted towards each other the laws of
comity in their fullest extent.   Money is frequently borrowed in
one State, by a corporation created in another.   The numerous
banks established by different States, are in the constant habit of
contracting and dealing with one another.   Agencies for corpora-
tions engaged in the business of insurance and of banking, have
been established in other States, and suffered to make contracts
without any objection on the part of the State authorities.   These
usages of commerce and trade have been so general and public,
and have been practised for so long a period of time, and so gene-
rally acquiesced in by the States, that the court cannot overlook
them, when a question like the one before us is under considera-
tion.   The silence of the State authorities, while these events are
passing before them, show their assent to the ordinary laws of
comity, which permit a corporation to make contracts in another
State.   But we are not left to infer it merely from the general
usages of trade, and the silent acquiescence of the States.   It ap-
pears from the cases cited in the argument, which it is unneces-
sary to recapitulate in this opinion, that it has been decided in
many of the State courts, we believe in all of them where the
question has arisen, that a corporation of one State may sue in the
courts of another.   If it may sue, why may it not make a con-
tract?   The right to sue is one of the powers which it derives

from its charter. If the courts of another country take notice of its existence as a corporation, so far as to allow it to maintain a suit, and permit it to exercise that power ; why should not its existence be recognized for other purposes, and the corporation permitted to exercise another power which is given to it by the same law and the same sovereignty—where the last mentioned power does not come in conflict with the interest or policy of the State ? There is certainly nothing in the nature and character of a corporation, which could justly lead to such a distinction ; and which should extend to it the comity of suit, and refuse to it the comity of contract. If it is allowed to sue, it would of couse be permitted to compromise, if it thought proper, with its debtor ; to give him time ; to accept something else in satisfaction ; to give him a release ; and to employ an attorney for itself, to conduct its suit. These are all matters of contract, and yet are so intimately connected with the right to sue, that the latter could not be effectually exercised, if the former were denied."

The year subsequent to the decision of the case from which we have quoted at so much length, the question again arose, and Mr. Justice Thompson, who delivered the opinion of the court, said : " The rights and powers of a corporation were very fully examined and illustrated by this court, at the last term, in the case of *The Bank of Augusta* v. *Earle*, 13 Peters, 584 ; in which case, and in various other cases decided in this court, a corporation is considered an artificial being, existing only in contemplation of law : and, being a mere creature of the law, it possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence. Corporations created by statute must depend for their powers and mode of exercising them, upon the true construction of the statute. A corporation can have no legal existence out of the sovereignty by which it is created ; as it exists only in contemplation of law, and by force of the law ; and when that law ceases to operate, and is no longer obligatory, the corporation can have no existence. It must dwell in the place of its creation ; and cannot migrate to another sovereignty. But, although it must live and have its being in that state only, yet it does not follow that its ex-

istence there will not be recognized in other places ; and its residence in one state creates no insuperable objection to its power of contracting in another. The corporation must show that the law of its creation gave it authority to make such contracts. Yet, as in the case of a natural person, it is not necessary that it should actually exist in the sovereignty in which the contract is made. It is sufficient that its existence, as an artificial person, in the state of its creation, is acknowledged and recognized by the state or nation where the dealing takes place ; and that it is permitted, by the laws of that place, to exercise there the powers with which it is endowed. Every power, however, which a corporation exercises in another state, depends for its validity upon the laws of the sovereignty in which it is exercised ; and a corporation can make no valid contract without the sanction, express or implied, of such sovereignty, unless a case should be presented in which a right claimed by the corporation, should appear to be secured by the constitution of the United States." 14 Peters, 129.

The reasoning and decision of the supreme tribunal of the nation, completely covers the case before us, and leaves us but the duty of applying the principles to it.

The charter of the Bank of the United States, as granted by the State of Pennsylvania, gives it the power to lend money and take security for its payment ; it therefore had a right to make the contract in question in this State.

Taking the legislation of this State as the true exponent of its public policy, we see nothing in it adverse to foreign corporations. If any description of corporation was more favored than another, at the date of this contract, it was banking corporations. Our statute book is filled with charters, the objects of which were to entice capital and bank paper from all quarters ; and it is now too late, to endeavor to repudiate the debts contracted with those, our people were then so anxious to deal with. At the present time, so far from the Legislature refusing to recognize the agents of foreign corporations, we see them authorizing their location in the State, by making them objects of taxation.

The defendants have endeavored to convince us, that articles

423 and 437 of the Civil Code and the act of the Legislature in relation to anonymous partnerships, are laws which forbid corporations created by other States, from contracting in this. B. & C. Dig. 614, sect. 6. They have not succeeded in doing so. The act of the Legislature relied on, does not, in our opinion, apply to corporations at all. Its purpose is to limit the responsibility of partners in private companies or partnerships, which any number of individuals may choose to form. The articles of the code are equally clear. The one first relied on is directory only, and declares that corporations, (meaning those in the State) must be created by the Legislature. It indicates the body that is to give them existence. Article 537 provides, that " corporations unauthorized by law or an act of the Legislature, enjoy no public character, and cannot appear in a court of justice, &c." It cannot be denied, we suppose, that the Bank of the United States is or was a corporation authorized by law in the State of Pennsylvania. The article plainly alludes to other corporations than those created by our own Legislature, otherwise it would not have been necessary to use the alternative expressions, which we see in it.

The last ground of defence is, that the contract is usurious. It is stipulated that the notes sued on, shall bear interest at ten per cent per annum until paid. This, the defendants aver, is a higher rate of interest than the Bank can, by its charter, receive. The words of the charter are, "the rate of discount at whieh loans may be made by said Bank within this commonwealth, shall not exceed one-half of one per centum for thirty days." The defendants insist, that this clause prohibits the Bank from contracting for a higher rate of interest elsewhere. We do not think so. If the Bank has the power to contract in this State, of which we have no doubt, it is competent for it to contract in conformity to the laws of the State. We are not prepared to say, that all the disabilities or restrictions, which the laws of a country impose on an individual or corporation in relation to contracts, follow them into our State, and render them incapable of contracting according to our laws. The Judge of the Commercial Court has reduced the rate of interest to six per cent. In this we think there is error, and as the plaintiffs have asked us to amend the judg-

ment by increasing the rate of interest to that specified in the contract, it will be so ordered.*

The judgment of the Commercial Court is amended by allowing the plaintiffs to recover interest at ten per centum per annum on the sum claimed, from the 17th of June in the year 1837, until paid, and in all other respects, it is affirmed, with costs.

*T. Slidell, B. Peyton, J. W. Smith* and *Grymes* for the plaintiffs.

*Josephs, G. Strawlridge,* and *Eustis,* for the appellants.

---

* The subjoined opinions were submitted to the court by the counsel for the plaintiffs in this case.

OPINION OF HORACE BINNEY, ESQ.

I have considered the question submitted by the Bank of the United States, in regard to the limitation contained in the 6th article of the 4th section of the charter granted by the State of Pennsylvania.

The question is a new one. It is not without difficulty; and as a great deal may depend on it, it would be very agreeable to me, if the views hereafter presented were submitted to Mr. Serjeant, before the Bank shall act upon them. I, however, proceed to give my opinion, leaving the disposition of it to the Bank.

The first paragraph of the 6th article ordains, that "the rate of discount at which loans may be made by the said Bank *within this commonwealth*, shall not exceed one-half of one per centum for thirty days." The question submitted to me is, whether it is lawful for the Bank to make a contract in another State, reserving a higher rate of interest, if the laws of that State authorize a higher rate.

The literal meaning of this clause is free from ambiguity. The Bank of the United States is prohibited from making a contract of loan, *within the State of Pennsylvania,* upon which a higher rate of discount is taken, than that which the article prescribes. The fair and natural meaning is as clear as the literal. The prohibition is limited, in its operation, to discount upon loans *within* the State. Nothing in the charter prohibits such contracts elsewhere. They are left to the operation of the general powers of the Bank, to the laws of the place where such contracts are made, and to general principles. If the Bank can lawfully make a contract in a foreign State, such a contract is not within the fair and natural meaning of the 6th article. It is proper to remark, that the language of this article differs from the corresponding provision of some other bank charters granted by the State of Pennsylvania. In the general Bank Act of 25th March, 1824, the enactment is as follows: "The rate of discount, at which loans may be made by any of the said Banks, shall not ex-

ceed one-half of one per centum for thirty days." In the charter of the Bank of Pennsylvania, the language is : "neither shall the said corporation take more than at the rate of half per centum for thirty days." In the charters of the Bank of Pennsylvania, and the Farmers and Mechanics Bank, it is the same. The rate of discount by Banks incorporated by the State of Pennsylvania, is, in nearly all their charters, restrained by language of the same import. It is not, however, universally so. The Bank of North America is not, as far as I can find, placed under any other restraint in regard to interest, than is imposed by a proviso, "that nothing herein before contained shall be construed to authorize the said corporation to exercise any power *in this state* repugnant to the laws or constitution thereof." As the law of the State prohibits more than six per cent interest upon loans made within it, it may be inferred, that this proviso restrains the Bank from charging a higher rate of interest upon such loans. It consequently may be inferred, that the loans of that Bank elsewhere, have been left as the loans of the Bank of the United States are left, notwithstanding the article in question.

Upon the effect of the restraining clause in the charters of all the other Banks, except that of the Bank of the United States, it is, however, unnecessary to express any opinion. In all, but that of the Bank of North America, it may have been intended to restrain the rate of discount upon their loans, any where and every where, or such may be the legal effect of the language. I do not mean to give any opinion upon the point. In the case of the Bank of North America, which was instituted to act by the aid of charters in different States, the State of Pennsylvania may have intended only to protect her own citizens within her own jurisdiction; and, therefore, she may have used a language which contains no express restraint upon any of the contracts of the Bank elsewhere, leaving them to the law of the place where they might happen to be made. But, be this as it may, in regard to the Bank of the United States, the words "*within this commonwealth,*" are not only new words in regulation of this subject, and therefore fairly inferring a new intention, but their plain and natural meaning, to confine the restraint to loans *within* the State, is so clear, that it will be in palpable violation of the article to extend the restraint to contracts made elsewhere.

The history of the day is so recent, that every one in Pennsylvania must know, that it was expected the Bank of the United States would endeavor to loan a part of her large capital in other States. The capital of the former Bank of the United States, which it was the design of the Pennsylvania charter to draw from the former corporation into the new one, was itself, in a great degree, composed of such loans; and from this state of cotemporary circumstances, as well as from the language of the article, I entertain the opinion, that the commonwealth of Pennsylvania intended to confine the Bank to a certain rate of discount upon loans, only *within* the State, and did not intend to restrain the rate upon loans made out of the State : that is to say, the State did not intend to restrain the corporation in this respect generally, but only lo-

cally. The case then presents legislation of the following kind : a Bank of Discount, incorporated by the State of Pennsylvania, is expressly restrained from charging more than a certain rate of discount upon loans *within* the commonwealth. The charter contains no provision in regard to loans elsewhere. If they are lawful at all, that is to say, if they are within the competency of the Bank, they are left without any restraint by the charter. What is the influence of such legislation upon contracts of loan made by the Bank at a higher rate of interest, in States where a higher rate is authorized by law, and where the Bank is not prohibited from entering into a contract of loan ?

It is particularly worthy of remark, that the Bank of the United States does not derive her power to charge interest upon her loans from the 6th article of her charter. The article is a restraint, and not a grant of power. In terms, it is only a restraint, and gives no power whatever, unless it may be the power of charging, by way of discount, six per centum on 360 days, or at that rate, contrary to what is thought to be the general rule under the usury laws. Where then does the Bank obtain the power to charge any discount or interest at all ? The power is, I apprehend, derived from her creation as a Bank of loan and discount. Her power is the general power. which every one has who possesses the means, and the capacity to loan. The Bank has this general power by her constitution, but within the State of Pennsylvania, its exercise is restrained by the 6th article. Neither this article, nor any other part of the charter, is a restraint upon the exercise of this power elsewhere. As a corporation, the Bank possesses the power generally ; and precisely as in the case of a natural person residing in the State of Pennsylvania, its power to lend its moneys upon interest to every body, and in every place, not violating the law of the place where the loan is made, nor the charter in making it *there.*

The situation of the Bank in this respect, I take then to be as follows :— She may make contracts of loan any where, the same not being contrary to the law of the place, and the exercise of the power must be subject to the restraints of that law, as it regards the rate of discount or interest, and so of every thing else. It must also be subject to the restraints of her charter whenever they apply. But the restraints of the 6th article in regard to the rate of discount apply only to loans *within* the State of Pennsylvania. Loans out of the State are not subject to this restraint, and are restrained only as the law of the place, in this respect, may restrain them. I consider this view to be in conformity with all that was settled by the Supreme Court of the United States, in the case of *The Bank of the United States* v. *Primrose*, 13 Peters, 519. To hold, that the 6th article is a general restraint upon the power wherever exercised, is to disregard the terms in which the restraint is imposed. It is a restraint in one particular, operating in one place only, and out of that place the general power has, upon principles of comity, all the effect which the laws of that place permit. I understand the position of those who deny the right of the Bank to loan in foreign places at more than six per

cent, is this :   That a corporation cannot exercise a greater power anywhere, than  it can exercise in the  place  where  it  is  incorporated ;  or, that  comity does not require a foreign place to permit or respect the exercise of a greater power.   The Bank of the United States, it is said, cannot, in the State where it is incorporated, discount at a higher rate than half per cent for thirty days, and  therefore  it cannot do so anywhere.   If this position is carefully  examined, it will not be found so imposing as at first  sight it may appear.   Comity does  not require  a  foreign State to permit either a corporation, or a natural person to exercise  any power within its  jurisdiction, in  opposition  to  its own laws ;  but if its own laws do not prevent, it is  the  part of  comity  to  respect and aid the  exercise  of  every power  which  a  corporation, without violating its charter, can exercise out of the  place  in which  it  is  incorporated.   The duty of comity  is, therefore, co-extensive  with  the  power  of  the  corporation, and  the only part of the  objection to which it is  necessary  to advert, is that which regards the power of the corporation.   A corporation  can  do  nothing out of the State in which it is chartered, or within it either, contrary to its charter ;  if its power is limited generally  or universally to certain  acts, as to purchase and sell bills of exchange, or  to effect  insurances  against sea risks, or fire,  or the like—it can perform no other acts any where.   The whole capacity of  the corporation is, by the law of its being, confined to such acts, and of course it is so confined every  where.   Comity  is not called upon to permit a corporation to exercise a power  in  another  State, which, by  the  law of  its creation, it is not competent to perform at all.   As to  acts of a different kind, the corporation has no legal capacity any where, and to permit the corporation to perfom them in another State, would be  to  create  a  corporation with new powers, and not to assist by comity the  exercise of powers plainly granted  to it.   In such  a case  it may  be  conceded, that  a corporation  cannot  exercise *without* the State  in which it is created, a greater power than it can exercise *within* it.   In  other words  a corporation  cannot  exercise  more power any where than its charter gives to it.   But  a general power  may  be given to  a corporation to perform certain acts, and there may be a restraint by the charter upon the  performance  of  them  at all, in a  certain  place, or except with a certain modification.   In such a case the  power is  general, and  the  restraint is local or modal.   Within the  district excepted, the restraint operates to curtail the general power.   Out of the district, the power exists without restraint. How stands such a case as to the operation of comity upon the general power in a foreign State, and out of the excepted district ?   If the  comity  of the foreign State respects the exercise of the power, undiminished by the  restraint, it does no more than sanction what the charter authorizes.   If it does not respect it, in consequence of the omission by the corporation to observe the  local restraint, then it does  not respect the  charter authority, nor  the  intention of the State that created it.   It treats the local restraint as an universal one, and so extends the exception as to make it a general rule.   The principle of such a construction, it is not easy to  comprehend.   I cannot assent to it, and it is

not difficult to suggest cases to show, that its operation must be both inconvenient and unreasonable. Take the case, for instance, of power given by a charter to a State Bank, to establish a branch any where but in the State, which grants the charter. Here the power would be general, and the restraint local. Could it be maintained, that because the Bank could not establish a branch within its own State, therefore it could not establish one in any other State? Yet this consequence would follow, if there be such a principle, that a corporation cannot exercise a power, out of its own State, which it cannot exercise within it.

Take another case: that a Bank in Pennsylvania is chartered, without any express restraint in the charter as to the rate of discount. If the general usury law of Pennsylvania extends to corporations, the Bank is, by that law, restrained from taking a higher rate of interest than six per cent within the State, and if there is such a principle, as that a corporation cannot exercise a power out of its own State, which it cannot exercise within it; then it follows, that in no case can a Bank make a contract for a higher rate of interest abroad, than the general law of its own State permits; and it would seem also to follow, that all the restraints of its own State laws follow it wherever it acts, and must be enforced and observed in a foreign State, however different from the laws of that State. Take a third case: that in the charter of the Bank of the United States, there had been added, to the restraint of the 6th article, a proviso that the restraint should not operate in the case of loans made out of the State. How would the matter stand then? It would then be indisputable that the State intended to leave the general power of the Bank unaffected by the restraint, and subject, in this respect only, to the restraint of the foreign law. Could it be contended that the Bank was not competent, by its charter, to make a loan in a foreign place at a higher rate of interest, if the law of that place permitted it. And if the power of the Bank, and the permission of the law of a foreign place were clear, could it be contended that there was still a principle that made the foreign contract invalid, because it would have been invalid at home? I think not. And yet what is the difference between such a case and the very case in question. If there is any, it is merely in the greater clearness of the intention of the Legislature of Pennsylvania, not to annex the restraint to loans made out of the State. But in my apprehension, that intention is abundantly clear from the language of the article as it stands without any such proviso. If the whole question be, what is the intention of the Legislature of Pennsylvania—then the principle suggested disappears, and the whole inquiry is the common one—what is the power given by the charter in regard to loans out of the State of Pennsylvania?

I find myself unable to assent to the proposition that a corporation cannot, in any case, exercise a more unrestrained power anywhere, than it can in the State where it is incorporated. There is no general principle to this effect. The power of the corporation depends upon the charter. The charter may expressly give power to be exercised in foreign places, without any restraint, except so

Frazier and another, Receivers, &c. v. Willcox and another.

far as the laws of the place prevent, and may nevertheless impose restraints upon the exercise of the power at home. It may give such a power by implication, while it restrains the exercise of the power within its own jurisdiction as it sees fit. The question, in every case, is a question of the interpretation of the charter—whether the power exists generally, and is only locally restrained—or whether there is such a universal restraint upon the power whereever exercised, as makes it the case of a power abridged or curtailed in its very creation. While I see no inconvenience in admitting, that if the power of a corporation does not, under any circumstances, extend to the valid performance of a certain act, the corporation cannot perform that act in a foreign State, whatever may be its laws; yet, if the general powers of the corporation extend to the act, and the charter imposes a restraint upon its exercise within certain limits, I cannot admit that, because the restraint operates within the jurisdiction of the incorporating power, there is any principle of law, that annexes the restraint to acts performed in a place out of those limits, though the law of that place knows of no suchre straint.

I do not think it necessary to lay any stress upon the words of the 6th article as comprehending cases of discount and loans of money, and not contracts generally, though certainly such is its language. Contracts of the Bank, by which new promises and securities are taken for former loans, or for bills protested and the like, are not discounts nor loans, and the article does not apply to them. The general law governs such cases where they occur; but even in regard to loans, properly speaking, I am of opinion, that out of the State of Pennsylvania, the Bank of the United States may make them at any rate of interest not prohibited by the law of the place.

HORACE BINNEY.

*Philadelphia, May* 27th, 1840.

MR. SERGEANT'S OPINION.

Having examined the above opinion of Mr. Binney, and considered the subject, 1 fully concur with him.

JOHN SERGEANT.

*Washington, June* 2, 1840.