MilligaN, J.,
delivered the opinion of the Court.
This bill was brought in the Common Law and Chancery Court of the City of Memphis, to enforce the payment of the interest due, and accruing on certain bonds, issued by the Memphis & Little Rock Railroad Co., secured by mortgage on real estate, in the City of Memphis, and to hold the trust property liable for the payment of the bonds, at their maturity.
There was a demurrer to the bill, which was overruled by the Chancellor, and the cause brought by appeal to this Court.
The facts necessary to be noticed, are as follows: The government of the United States, by An Act of *647 Congress, approved the third day of August, 1852, ceded to the Mayor and Aldermen of the City of Memphis, seventy-five acres of land, known as the “Navy Tard property,” and lying within the corporation limits of the city, “for the use and benefit of the city,” which was formally accepted by the corporation authorities, and the title in fee, vested in the corporation.
The Memphis & Little Rock Railroad, connecting the cities of Memphis, in Tennessee, with Little Rock, in Arkansas, was in process of construction; and as it is alleged in the bill, its completion would greatly increase the wealth, and extend the the commercial facilities of the former city. The Railroad Company, as it seems, was unable, promptly, to supply the means necessary to complete their road; and the Mayor and Aldermen of the City of Memphis, acting under the belief, that its completion would be advantageous to the growth and prosperity of the city, on the 30th of January, 1857, adopted the following ordinance:
“1st. Be it ordained by the Board of the Mayor and Aldermen of the City of Memphis, That all the grounds and property, known as the ‘Memphis Navy Yard/ are hereby appropriated to the construction of the first section of the Memphis & Little Rock Railroad, from the west bank of the Mississippi River to the St. Francis River, on terms and conditions, as follows: On the procurement, by the Memphis & Little Rock Railroad Co., of an additional solvent bona fide subscription to its capital stock, amounting *648 to one hundred thousand dollars, exclusive of the subscription of the City of Little Rock, made by corporations, counties or individuals, satisfactory, as to solvency and validity, to the finance committee; or whenever said Memphis & Little Rock Railroad Company, shall present to the finance committee, a good, valid and satisfactory guarantee, that such stock subscription of one hundred thousand dollars, shall be made within the next twelve months thereafter; thereopon, the Mayor of the City of Memphis, shall be authorized and empowered to mortgage the 'Memphis Navy Yard property’ ground, and improvements, belonging to the City of Memphis, to secure the prompt and certain payment of three hundred thousand dollars of the post bonds of the Memphis & Little Rock Railroad Company, payable fifteen years after date, with seven per cent, per an-num interest thereon, payable semi-annually,' in the City of Charleston, or New Orleans; interest coupons to be attached to said bonds.
“2d. That the City revenue, arising from the ‘Memphis Navy Yard property,’ be, and the same is, hereby appropriated, not to exceed thirty thousand dollars per annum: First to the payment of the interest on the three hundred thousand dollars of the bonds of the Memphis & Little Rock Railroad Company, as herein above set forth, and the balance to be held and used as a sinking fund for the retirement of said bonds.”
Afterward, and in pursuance to the above ordinance, on the 10 th day of May, 1857, the Mayor and Al *649 dermen of the City of Memphis, acting with the Memphis & Little Rock Railroad Company, who are parties to the deed, transferred and conveyed to Sam Tate and James Elder, their heirs and assigns, the whole of the seventy-five acres of land, within the City of Memphis, known as the “Navy Yard property.” This deed, as it appears upon its face, was made “to secure the prompt and certain payment of the $300,000 of the post bonds of the Memphis & Little Rock Railroad Company, before mentioned, and the interest thereon, as per coupon warrants, before recited; and for no other purpose.”
Eolio wing this condition in the deed, it is stipulated and agreed by the parties, substantially as follows:
1st. The Memphis & Little Rock Railroad Company, are to issue, on the 1st day of July, 1857, three hundred bonds, of one thousand dollars each, making in the aggregate, $300,000, with coupon warrants attached, bearing seven per • cent, interest, and payable semi-annually, in Charleston or Hew Orleans, at the option of the Railroad Company, fifteen years after date.
2d. The Mayor and Aldermen of the City of Memphis, obligate themselves, as a corporation, to pay the principal and interest of said bonds, as they fall due; and for that purpose appropriate the rents and revenues arising from the trust property, to an amount not exceeding $30,000, to the payment of the accruing interest; and the remainder, to the retirement of the bonds.
*650 3d. It is stipulated, that in tbe event the Mayor and Aldermen of the City of Memphis, should, fail to meet, and pay, any one, or more, of the bonds, at maturity, then, the trustees, after giving sixty days’ •notice, shall proceed to lay off the lands conveyed, into suitable lots, and sell the same, or so much thereof, as may be necessary to raise the required sum, and apply the proceeds to the necessary costs and charges, and to the payment of the bond or bonds that may be due, and unpaid, and pay over the balance, if any, into the city treasury.
4th. It is also provided, that if the interest accruing on the bonds, should not be paid promptly, at, or before the maturity of the bonds, that the trustees shall collect the taxes, rents, etc., arising on the trust property, to an amount not exceeding $30,000 per annum; and, if the taxes previously levied, are insufficient for that purpose, they may proceed to other leases, or to rent out other portions of the trust property, to raise the necessary means to meet and pay off the interest due; and any balance that may remain, after discharging the interest over due, shall be paid into the city treasury, and be held as a part of the sinking fund.
5th. In this clause it is provided, that, in the event of the resignation, death or removal of the trustees, that the Chancery Court, on application of the Mayor and Aldermen of the City of Memphis, the Memphis & Little Bock Bailroad Company, or any bond-holder, may appoint their successors.
6th. It is further provided, that the three hun *651 dred "bonds, secured by this mortgage, shall have the certificate of the trustees indorsed thereon, that they are secured by this deed; and that such a certificate shall not appear upon any other bonds, issued by the Memphis & Little Rock Railroad Company.
7th. This clause provides, that upon the payment of the principal and interest of the three hundred bonds aforesaid, that all the rights and benefits, contemplated by the first and fourth sections of the ordinance of the Mayor and Aldermen of the City of Memphis, hereinbefore set out, shall ensue to the City of Memphis; and the Memphis & Little Rock Railroad Company, obligate themselves, faithfully to comply with the terms of these sections of the city ordinances.
8th. The eighth and last clause provides, that, “if the City of Memphis shall fully pay and discharge the interest and principal of said bonds, so as before said to be issued, and which this indenture is made to secure; or if at any time prior to the maturity of said bonds, the holder thereof should convert, or return them, by accepting the stock of the road in their stead, then this indenture, and the interest and estate hereby granted, shall be utterly void.”
This mortgage or trust, was signed by the Mayor and Aldermen of the City of Memphis, Tate and Elder, the Trustees and the President of the Little Rock Railroad Company, and duly acknowledged and admitted to registration, on the 30th day of June, 1857; and thereafter, on the first day of July, follow *652 ing, the Memphis & Little Rock Railroad Company issued three hundred bonds, of the denomination of one thousand dollars each, as provided in the city ordinance and mortgage, which were duly certified by the trustees, as required by the terms of the mor-gage.
The language of the Certificate is as follows, viz.:
“We, the undersigned Trustees, named in the deed executed by the Mayor of the City of Memphis, upon the Navy Yard grounds, and improvements therein, situated in said City, and the rents, leases and profits arising from the same, to the extent of $30,000 per annum, made to secure the principal and interest of $300,000 of the bonds of the Memphis and Little Rock Railroad Company, certify that the within bond is one of the issue entitled to the security of said trust mortgage; that said mortgage covers the' entire property, known as the Navy Yard, and all the improvements thereon, in the City of Memphis, Tennessee, containing about seventy-five acres, with the rents and profits of the same, to the extent of '$30,000 per annum; that said mortgage has been duly executed, and delivered to said Trustees, by the City of Memphis, in accordance with an ordinance passed by the City Council of said City; that said mortgage gives the parties named therein, the power to sell said grounds and improvements, or sufficient thereof, without suit, on sixty days’ notice in two newspapers, published in the City of Memphis, to pay interest, or principal of said bonds, when due, and not paid by said Railroad Company; that said mortgage is regis *653 tered in the Register’s office in Shelby County, in which said Navy Yard property is situated.”
Under this state of facts, the bonds of the Railroad Company were issued, indorsed, and thrown upon the market. The complainants, as they allege in their bill, and which is admitted by demurrer, are the owners and holders, bona fide, for value, of a number of these bonds, upon which the interest was regularly paid, by successive administrations of the City Government, until 1862, when the Mayor and Aldermen of the City of Memphis failed and refused to further pay the interest accruing thereon, or to allow the Trustees to collect the rents arising from the trust property, as provided by the City ordinance, and mortgage.
It is further alleged, that the Memphis and Little Rock Railroad Company, in consequence of the late war, are greatly embarrassed, if not totally insolvent; and that the Trustees appointed under the deed, have failed to take the steps necessary to enforce the payment of the rents to them, or in any manner, to perform the duties imposed upon them by the terms of the mortgage; and therefore, they ask for the appointment of a receiver, and the aid of a court of equity, to enforce their rights under the trust.
Under the foregoing facts, this bill was filed; and the question upon which the case principally turns, involves the power of the Corporation of the City of Memphis. Had the Mayor and Aldermen, as the Representatives of the Corporation, the power, under the acts of incorporation, to dispose of this property, in the manner, and for the purposes set forth in the mortgage? *654 By tbe 3d Section of the Charter of the Corporation of the “Mayor and Aldermen of the City of Memphis,” it is declared, that they may, by their corporate name, “sue and be sued in all Courts of law and equity; may purchase, receive and hold property, real, personal, or mixed, within the City, for all needful purposes of the City; and may alien, sell, or dispose of the same, for the use and benefit of the City; and may purchase, receive, or hold property, real, personal, or mixed, beyond the limits of the City, to be used for the burial of the dead, for the erection of water works, to supply the City with water; for the obtaining of gravel, sand, or other materials, to improve the streets, alleys, and avenues of the City, and for other purposes; for the establishment of work-houses, poor-houses, houses of correction, magazines, hospitals, and infirmaries; and may sell, lease, or dispose of the same, for the use and benefit of the City, and may do and perform all other acts, as natural persons.”
The powers of municipal corporations, as a familiar principle, are limited to the grants in the Charter, and such as are necessarily implied. The power “to hold real, personal or mixed property,” and “to sell, lease, or dispose of the same, for the use and benefit of the City,” by necessary implication, under the enlightened jurisprudence of modern times, comprehends the power to exercise such other powers, not expressly granted, or forbidden by the terms of the Charter, or the general laws, which are necessary to develop the growth and' prosperity of the City. Were it not so, no growing town or city could conform its local administration to *655 the shifting and increasing -wants of its population. The municipal government would be constantly crippled in its action, by the restraints of a refined and technical construction of its powers. A corporation is, in the estimation of the law, a body created for special purposes, and there is no good reason why it should not, in the execution of these purposes, resort to any means that would he necessary and proper for an individual, in executing the same, unless it be prohibited by the terms of its Charter, or some public law, from so doing: Union Bank vs. Jacobs, 4 Hum., 515, 525; the Mayor and Aldermen of Memphis vs. "Wright, 6 Yer., 497. But in the exercise of the necessary incidental powers of a corporation, a most perplexing and difficult question often ■ arises. Corporations may not apply their funds or property to any other than “corporation purposes.” What “corporation purposes” are, is a question not always free from difficulty. <■ In the case of McCallie vs. The Mayor and Aldermen of Chattanooga, 3 Head, 317, it is said, “Every attempt to lay down an exact general rule, by which to determine what is a corporation purpose, must prove nugatory. The question must necessarily be decided in view of the facts of each particular case. And while we do not mean to say, that ■the judgment of the local government of the town is to be taken as conclusive of the question, whether the object proposed be a legitimate corporation purpose,' yet we think it might, in general, be safely taken as prima facie evidence of the fact; for it will, perhaps, be fqund, in most cases, that an intelligent Board of Aldermen are more capable of forming a correct judg *656 ment as to what measures are of a nature to promote, more or less directly, the general interests and prosperity of the town, than any other tribunal.”
Admitting the force of this authority, and its applicability to the case under consideration, there can he no doubt, that the purpose for which the mortgage in question was executed, was for a legitimate, “corporate purpose.” The Memphis & Little Rock Railroad, not only by means of railway communication, connected the city of Memphis with the city of Little Rock, in Arkansas; hut it opened up a great commercial thoroughfare with' the richest and most fertile regions of the South, by which the trade and commerce of the two localities could be readily interchanged, and the growth and prosperity of both promoted. The fact that one of the termini of the road, was on the western bank of the Mississippi River, can make no difference. The practical advantages derived to the city of Memphis, by the construction of the road, we apprehend, are not materially diminished by its termination on the western bank of the river, immediately opposite the town. No objection can be taken, therefore, to the contract on that ground; nor will any lie to it, on account of the fact, that the bonds secured by the city mortgage, were to be applied to a work in another State: Sneed, 66.
We are of opinion, therefore, all other things out of the way, that, by a fair and reasonable interpretation of the incidentals granted by the charter, the Mayor and Aldermen of the city of Memphis, had the power to dispose of the Navy Yard property, “by sale, *657 or mortgage in trust, for the purposes therein contemplated; and that the purposes' of the mortgage were legitimate ‘corporation purposes/ for the use and benefit of the city.” '
But it is insisted, in argument, that, whatever the original or incidental powers of the corporation may have been, under its former character, they are limited by the Act of 1856, which, in terms, prohibits- the Board of Mayor and Aldermen from issuing the bonds of the city to railroad companies, without the consent of the majority of the qualified voters of the corporation; and that the corporation cannot do indirectly, by mortgage, what it is prohibited from doing directly.
This argument, although plausible, is, nevertheless, we think, fallacious. The mortgage was executed on the 10 th of May, 1857', and registered the 30th ©f same month thereafter. The bonds which it was- made secure, bear date the 1st of July, 1857.
Prior to this time, on the 13th of Eebruary, 1854, an Act was passed, entitled, “An Act to amend, the charter of Memphis.” By the third section of this Act, among other things, it is provided that the Board of the Mayor and Aldermen, by and with the consent of a majority of the qualified voters of the city, may issue the bonds of the city, “for the purpose of aiding in the construction” of railroads leading into or near the city of Memphis; but the bonds so authorized to be issued, cannot be delivered until the first fifty miles of the road, for the benefit of which they are issued,* from or near Memphis outward, shall be graded, bridged, *658 and made ready for the iron rails; and the bonds, when thus issued and delivered, cannot, by the terms of this section, be used for any other purpose, than for ironing and equipping the road.
Two years after the passage of this Act, and at the next succeeding Legislature, on the 29th of February, 1856, the 3d section of the 4th article of the Act, to amend the charter of Memphis, is repealed, and the corporation prohibited from issuing its bonds, even with the consent of the qualified voters, except for special corporation purposes therein, and that in limited quantities.
Following this Act, on the 20th of February, 1860, and after the execution of the mortgage in question, the Legislature passed another Act, amendatory of the charter of the city of Memphis, in which the limitations imposed' by the Acts of 1854 and 1856, upon the authority of the corporation, are, in many and important particulars, removed. The Board of the Mayor and Aldermen, are authorized, with the consent of the people, to issue the city bonds to the various objects therein named, among which is the Memphis & Little Bock Railroad, bearing interest, not exceeding ten per cent., and running thirty years to maturity.
We have been thus particular in presenting the substance of these somewhat remarkeble alterations in the city charter, which followed each other in rapid succession, and which, it may be said, were marked with a ■singular versatility, that it might the more clearly appear, (amid the shifting opinions of the corporation, to *659 the powers of' their fundamental, law, to . issue time bonds,) that no legislation has altered, enlarged, or restricted the original grant of power, to sell, lease, or otherwise dispose of the corporation property, for the use and benefit of the city. Upon this right, this case must turn.
The question of the power of the corporation to issue the bonds of the city for objects of internal improvements, does not arise. The bonds have been issued— more are proposed to be — and the simple question is: Had the Mayor and Aldermen of the City of Memphis, the power, under their charter, to mortgage this real property, for the benefit of a legitimate corporate purpose? This right is denied, in argument, on the ground that it involves the right of taxation, and imposes the necessity of supplying the amount of taxes withdrawn, under the mortgage, by the imposition of a similar amount upon other property remaining in the city, subject to taxation. The argument is suicidal, and results in a practical denial of the power of the corporation to sell or dispose of its -taxable property, under any circumstances, and for any purpose. The power to sell, carries, of necessity, with it, the power to convey in trust, and the result of an absolute sale; and a conveyance in trust, to secure, as in this case, the mortgage bonds, accompanied by a pledge of the taxes, and rents arising from the property conveyed, for the payment of the interest accruing on the bonds, is, in this respect, precisely the same; and the same reason that would justify the one, would be alike applicable to the other.
*660 In the case of White Water Valley Canal Company vs. Yallite et al., 21 Howard, 424, it is said: “It is well settled, that a corporation, without special author» ity, may dispose of land, goods and chattels, or of any interest in the same, as it deems expedient; and, in the course of their legitimate business, may make a bond, mortgage, note, or draft; and also, may make composition with creditors, or an assignment for their benefit, with preference, except when restrained by law: Partridge vs. Barber, 25 Barb., 146; Barry vs. Merchants’ Ex. Co., 1 San. Ch. R., 280; Burr vs. Phoenix Glass Co., 14 Barb., 358; Hater vs. Bank of the U. S., 5 W. & S., 223; Frazier vs. Wilcox, 4 Rob., 517; U. S. Bank vs. Huth, 4 Boul, 23; The State vs. Bank of Md., 6-9 and I., 323; Pierce vs. Euary, 32 N. H., 486.
But, admitting the power under which the Mayor and Aldermen of the City of Memphis acted, was doubtful, (which we are not prepared to concede,) and that there were irregularities in the execution of the mortgage, the law seems to be well settled, that it does not, at this late day, lie in the mouth of the city authorities to repudiate their own acts. The bonds were issued by the Memphis & Little Rock Railroad Company, in accordance with an ordinance of the City of Memphis, and the mortgage for their security duly executed, acknowledged and registered, and a certificate of these facts, formally indorsed by the trustees, on each bond. Thus secured, indorsed and accredited, these bonds were thrown upon the market; and the complainants, as it is stated in the bill, and admitted by the demurrer, *661 became the bona fide, owners and holders of them, with the interest coupons attached, for a valuable consideration. Superadded to this, the regularity of these proceedings, and their binding effect upon the City of Memphis, were recognized by two or more successive administrations of the city government, and the interest coupons promptly paid, according to the terms of the mortgage. Now, can the city take advantage of its direct want of authority in the charter, if such was the case, or its own irregularities in executing the mortgage, or endorsing the bonds? We think not. They must be held bound by their own acts. This doctrine is in harmony with both reason and authority.
In the case of Jabriskac vs. The Cleveland, Columbus & Cincinnati Railroad Company et al., 23 Howard, 381, a similar question was presented before the Supreme Court of the United States. In that case, it appears that the appellant was a stockholder in the corporation known as the Cleveland, Columbus & Cincinnati Railroad Company, which, as it is alleged, illegally indorsed a guaranty upon four hundred bonds, of one thousand dollars each, with interest coupons, at the rate of seven per cent, per annum, payable to Elias Eossett, or bearer, in New York, in 1859, that had been issued in that month, by the Columbus, Piqua & Indiana Railroad Company and the Indianapolis & Bellefontaine Railroad Company, to the prejudice of the stockholders, and the builders of the resources of the said Cleveland corporation. The object of the bill was to obtain a decree to restrain the Company, pending the suit, from paying the interest; and upon a declaration of the illegality of *662 the Ronds, to enjoin the corporation from applying any of its„ effects to their redemption.
In that case, the question of the power of the Cleveland, under its charter, to guaranty the contracts of corporations, or individuals, came under review. And Campbell, Judge, in delivering the opinion of the Court, after referring to the Acts of the Ohio Legislature, and showing that they were in force, and that their provisions had not been complied with, in summing up, proceeded to say: “But we are to regard (the conduct of the corporation from an external position. The community at large must form their judgment of it from the acts and resolutions adopted by the authorities of the corporation on the meetings of the stockholders, and by their acquiesence in them. These negotiable securities have been placed on sale in the community accompanied by their resolutions and votes inviting public confidence. They have circulated without an effort on the part of the corporation, or corporations, to restrain them, or disabuse those who were influenced by these apparently official acts. Men have invested their money on the assurances they have afforded. A corporation, quite as much as an individual, is held to a careful adherence to truth in their dealings with mankind, and cannot, by their representations, or silence, involve others in onerous engagements and then defeat the calculations and claims their own conduct had superinduced.” The same principle was again recognized by the Supreme Court of the United States, in the case of Mercer County vs. Hacket, 1 Wallace, 93. Grier, Judge, in delivering the opinion of the *663 Court, said: “We have decided in the case of the Commissioners of Knox County vs. Aspinwall, that when the bonds on their face, import a compliance with the law under which they were issued, the purchaser is not bound to look further. The decision of the Board of Directors may not be conclusive in a direct proceeding to inquire into the facts before the rights and interests of other parties had attached; but after the authority had been executed, the stock subscribed, and the bonds issued and in the hands of innocent holders, it would be too late, even in a direct proceeding, to call it in question: See, also, Commissioners of Knox County vs. Aspinwall, 21 Howard, 548; Avery vs. Mayor and Aldermen and citizens of Alleghany City, 21 Howard, 365, 375; Van Harstrap vs. Madison City, 1 Wallace, 291, 297.
If, in these cases, the corporation, with the various irregularities in their proceedings, were held liable to the bond holders, much more, in this case, ought the Mayor and Aldermen of the City of Memphis to be responsible. The mortgage was. executed under authority of the. charter, and for a legitimate “corporation purpose.” The bonds are negotiable, securities fair upon their face, and issued in strict conformity to the ordinance of the City Council. Their regularity and validity have been repeatedly acknowledged in the payment of the interest coupons. The owners are bona- fide holders for a valuable consideration, and it would be inequitable, at this late day, to allow the City Council to repudiate their own acts.
The decree of the Chancellor disallowing the demurrer, will be affirmed, and the cause remanded.